Judge Rowan
delivered the opinion of the court.
Walter Scott having departed this life in Montgomery county, state of Maryland, administration of his estate was in March, 1793, granted by the orphan’s court of that county, to Cassandra Scott, his widow and relict.
The estate of the said Waller consisted of a negro man, valued in the appraisement and inventory thereof, at Z76; a negro woman, valued at 160; a negro boy, valued at 115, and other articles and credits, making therewith, in the whole, 1360. The said Scott left one child, a daughter, named Elizabeth Margaret Scott, and his wife Cassandra, ensient of a son born about six months after his decease, who died at between twelve and twenty months of age.— The Said Cassandra intermarried about eighteen months after the decease of the said Walter, with a certain Thomas Nichols, (of Simon)who, with his wife, the said Cassandra, on the 13th of August, 1805, exhibited in the orphan’s court Of that county, an account of their administration of the said estate, in which they charged themselves with the amount according to.the inventory and appraisement made and returned therein, while the said Cassandra was sole ad-ministratrix, and claimed payments and disbursements to the amount of about 1241 1C 8‡, which account was examined, passed, and ordered to be recorded bv the said court. Andón the29th of that month, the said Nichols was appointed by that court guardian to the said Elizabeth M. Scott, she having made choipe of him as such; whereupon he executed the bond usual in such cases, with Solomon Holland and Kenzey Gettings his sureties — and shortly after removed to the state of Kentucky, bringing with him the said Elizabeth and the negroes aforesaid.
The said Elizabeth having, not long after the removal aforesaid to Kentucky, arrived at the age of sixteen >ears, intermarried with the said William L. Meridith; and on the lOtli da' of July, 1809, she and her said husband, William L. Meridith, executed to the said Thomas and Cat?» jtandra the following writing:— * •
‘‘Received of Thomas Nichols and bis wife Cassandra, ‘‘three hundred and thirty-seven dollars and fifty four cents, frit being tire amount of principal and interest due Eliza *596 “beth M. Scott, agreeable to the staled account from the “orphan’s court of .Montgomery county and state of Mary“land, “W. L. Meridith, jr.
“Elizabeth M. Meridith.
“Test — George H. Offult.”
The negro woman aforesaid had several children, and some of har children'bad children, so that when this suit was instituted there were, in all, twelve or thirteen slaves; to obtain two-thirds of which in kind, the said William and wife on the 11th day of June, 1818, instituted this suit, in which they also claimed hire for their proportion, during the period of their detention.
They alledgc in their bill and amended bill, that at the time they received the money from the said Thomas and Cassandra, and gave the receipt above recited, they were ignorant of their rights. That by '(he laws of Maryland (of which they were then ignorant) the said Elizabeth was entitled to two-thirds of the said slaves in kind, and that it was not competent for the said Thomas and Cassandra to take the sai.d property, and charge themselves therewith, and that their having done so, and the examination and passage of their account evincive of that fact, by the orphan’s court, did not alter their rights. They charge the'defendants with fraudulently concealing from them, at the time of the settlement, before and since, the true state of their claim, and of the facts in relation to the negroes aforesaid. The complainant, William, alledges particularly,' that he never was in the state of Maryland, and knew nothing of its laws, and that as soon (or very shortly thereafter) as he Came to know his rights, he commenced this suit.
The defendants deny fraud or fraudulent intent; — they deny that complainants were, at the time of the settlement and receipt aforesaid, ignorant of their rights, or that there was, on their part, any concealment, or misrepresentation of the facts of the case in relation to tiic said negroes, or any other part of their administration of the estate of the said Waiter, deceased. They say that upon their intermarriage, the estate of the said Walter was indebted and embarrassed; and that to prevent the said slaves from being sacrificed at public sale pursuant to an order of the orphan’s court, for the payment of the debts, which order might, in such cases, under the laws of that country, have been obtained; the said Thomas and tile said Cassandra concluded it) take them at their valuation by the appraisers, and pay *597 the debts of the estate out of the private and individual funds of the said Thomas. That the said Thomas raised private funds, and applied them in that way, at much inconvenience to himself: that he was induced to do so from the consideration, not only that the negroes would be sacrificed if sold, but that the retention of them at their valuation would contribute to the more comfortable support and sustenance of the family, and particularly that their retention as aforesaid would contribute to the more comfortable rearing and education of the said Elizabeth. They state that the? supposed they had a right to retain the said ne-groes at their valuation, when they did it, and they were confirmed ⅛ this supposition by its approval by the orphan’s court. They state that the said Cassandra was entitled to one-third of the said negroes, under the laws of that state, absolutely as the widow of the said Walter, and to one half of the third, which was tire portion of her son Walter, who was born after tire death of his father, and departed this life as aforesaid; — and they insist that if distribution in kind is to take place, they are entitled to half'of. the said negroes, on the grounds and for the reasons aforesaid: They state that complainant, Eiizabelb, had arrived at the age of sixteen before she intermarried with her co-complainant: that sixteen is the age of maturity in a female by the laws of Maryland. They insist, moreover, that if distribution is to be made in kind, they ought to be allowed for the education, rearing and clothing of the said Elizabeth, and for the trouble and expense of rearing the young negroes. But they insist that the settlement which took place between the complainants and them, more than seven years before the institution of this suit, and the payment to them for their proportion of their father Walter’s estate, according to the settlement thereof, made with, and approved by, the orphan’s court m Maryland, and the receipt which they passed to defendants for the amount thereof, should bar their recovery in this action.
The cause came on to be heard, and upon a final hearing the bill was dismissed by the chancellor, from which decree of dismissal complainants appealed.
Li this case this court are free to acknowledge they have experienced considerable difficulty in forming an opinion entirely satisfactory to themselves. What is the power of the orphan’s court in the state of Maryland, and what aré the laws and usages in relation to the powers, privileges *598 and duties of administrators; the rights of widows anddi$-tribúteos, in and to the slaves of the intestate, in that Commonwealth, are not perceived, with sufficient distinctness, to enable the court to say what were tiie rights and liabilities of the parties under the several aspects of this case.™» That court, it would seem, has the power to direct Ihe slaves of an intestate to be sold for the payment of his debts: But that it has the power to permit the administrator to take the slaves at their appraised valuation, upon his payment of the debts of ihe intestate, to the amount thereof, does not appear from any law of that state to which we have had access, And yet from the court’s examination of the administrator’s account exhibiting that state of fact, and ordering it to be passed and recorded, it would seem that the judge possessed the power. But if he did not possess the power, we are not so clear that the erroneous assumption of it ought not to be corrected bv the appropriate supervising tribunal of that state; and that until such re-r visa), the tribunals of this state, before vyhom it could be brought collaterally only, ought not to presume its existence and legitimate exercise. If the powers of that court were ascertained to have been competent to the affirmance or vacation of the claim to the slaves in question, at their appraised value, by the administrators, this court could fee! but little difficulty in determining the import and legal effect of its judicial act in passing and recording the account of the administrators in this case. But having doubt as to the jurisdiction of the court, or rather inclining to think it transcended its jurisdiction in that act, we cannot infer therefrom a valid investiture of the negroes in the appel-lees: but we may infer from it, that the appellees acted without any fraudulent intent, in relation to the creditors or distributees, and that they honestly believed that they became thereby the proprietors of the slaves, fairly, and for a fair price. This inference is not only sanctioned by fhe adoption and passage of the account aforesaid, by the court, but by the consideration that the appellees, if their impressions and motives had been other than they represent them to have been, could have procured an order for their sale, and purchased them formally, with the same money which they applied in that view to the payment of the debts of the intestate; for when the value of those negroes was ascertained by the appraisers, Cassandra was sole agent in the case, and under the pressure of grief, consequent upon' *599 the recent death of her husband. Thus situated, she cannot be supposed either to have influenced the appraisers violate their duties and their oaths by a reduced, and of course, corrupt valuation of the slaves, or to have felt a single motive to do so. To indulge the presumption, that under the fresh agony of such a privation, she should be employed, in the violation of her oath, to defraud her infants, would be not only to forget the charities of life, but to outrage the common feelings of humanity. We cannot, therefore, think that she, in that part of the transaction, either practised or meditated a fraud upon her infants. If she did not, we can see no motive of a fraudulent sort which could afterwards influence her husband to pay the valuation and keep the slaves.
If there was no fraud in the conduct of either of the ap-pellees, if none is proved (and we think there is none) in this transaction, and there are doubts as to the nature and extent of the rights of the parties thereto — it remains to be enquired, whether a possession of these slaves (innocent, probably erroneous, certainly not fraudulent,) for near twenty-live years, should, under the circumstances of this case, be disturbed?
The impression of the appellees was, that they were entitled to but one third of this estate; they paid (as we think they believed) for the oilier two-thirds — we are strongly inclined to believe they were entitled to one half. But theb belief that they were entitled to but one third of these slaves, is evinced by their acting conformably to that criterion throughout, up as late as the year 1809, when they settled with, and paid ihe complainants for, the two-thirds of their estimated value, as ascertained by the appraisers-In that year, the complainants having been intermarried ion about two years, assert their claim to their proportion of this* estate. The account in which the appellees had charged ■ themselves with the amount thereof, according to its appraised valuation1, is exhibited to them, and forms the bask of their settlement; and they receive two-thirds of the re- , sidue thereof, after the payment of the debts. At this time Meridith had certainly arrived at his full age, if he were an infant at the time of bis marriage, as he alledges; and his wife it appears had married at the age of sixteen (which is alledged to be her age of maturity according to the laws Of Maryland,) long before. But they were ignorant, it is «Hedged, of their rights, Of the facts in the case they *600 cannot be supposed to have been ignorant: She must have known of the three slaves of which her father died possess? ed: — She had been raised with them; and from the family? from her kindred, from neighbors, and even from them, by the female of whom she had no doubt been often nursed, she must, it is presumed, have learned that they were the property of her father; — whatever knowledge she had upon this subject, it must be presumed, from the nature of the marriage connection, was communicated to him. But seven years elapse after this settlement before the institution Óf this suit: can it be presumed that during all this time the appellants were ignorant of their rights? In this time the female children of Peggy may have commenced nursing, and the number of the slaves, may have encreased greatly; and an incentive to abandon the settlement which had been so long acquiesced in, and assert a claim to a division in kind, may have been found in the increased number of the slaves. While we are urged by the appellants to look for mercenary and fraudulent motives in the appellees at the time they claim to have innocently'(if illusively) invested themselves with the three negroes, it is but just that we should look for the like motives in the conduct of the appellants in relation to twelve or thirteen' negroes, if the half of three negroes, at the disinterested valuation of sworn appraisers, in a state, and at a time where, and when the law had fixed the estimation of that kind of property, in its assessment for taxation, at a very low rate, (that of the best fellow at 145, and of the best Woman at 130,) could be supposed to awaken the avarice of the appellees, what ought to be the influence of two thirds of twelve or thirteen slaves, in this state, where slaves rate very high, in producing the like effect on the appellants? But fraud should not be presumed in relation to either. It is alike against the law and the duties of charity to presume fraud. It must be proved in every case in which it is made the basis of adjudication.
In this case we have not been able to discern any proof pf fraud on the part of the appellees. Indeed we think it ⅛ negatived not only by the proof of the declarations of one of the complainants, but by the circumstances of the case, and the conduct of the appellees, as has been ’above remarked. Upon the supposition that the appellees were mistaken as to the law and the adjudication of the orphan’s court of Maryland; the reflection that the conseijuences of *601 that mistake, are not other, or worse, for the appellees, than might, and probably would, have been, those of an entirely legal and not less innocent, appropriation of the ¿laves, connected with the ratification and long acquiescence of the appellants, incline this Court to affirm the decree.
The negroes might have been sold by order of the court for the payment of the debts, and there is no proof, nor is there any reason to believe that they would have sold for more than their appraised valuation; or they might, in case there had been no necessity to sell them, have been divided by order of the orphan’s court, or decree of the chancellor, in which case there is every reason to suppose that Peggy would have been allotted to the widow; every consideration of fitness, of feeling and of delicacy, in relation both to the mother and the child, would have influenced either court so to have made that allotment. There would, moreover, have been convenience as well as justice and fitness in that shape of allotment. The value of Peggy was just one third of the value of the remaining two. Had Peggy been allotted, ás we think under the circumstance she would, and ought, to have been, to Cassandra, the mother, the offspring of Peggy would have belonged to the appel-lees, according to the maxim ‘■•partus sequtur ventrem.”— These, and many of the foregoing considerations, while they do not form the basis of the opinion we are about to give, are not without their influence in the construction which leads to that opinion. The opinion is formed mainly upoti the affirmance by the appellants of the tenure of the appellees in 1809 in the settlement then made, the payment and receipt of the money, and the construction of the receipt tiler f ir, executed hv the appellees to the appellants, and the subsequent acquiescence of the appellees. It must be acknowledged that either fraud or mistake, in a transaction, may be released by the party injured thereby, and the transaction affirmed, the fraud or mistake notwithstanding. Upon the supposition that the claim of the ap-pellees was bottomed upon a mistake of the law of Maryland in relation thereto, we think the settlement of 1809, a waiver of that mistake by the appellants. It will not do to unsettle the transactions of men, and alter the state of property after the lapse of man» -tears, upon the supposition that the parties thereto were ignorant, not of the fact, but of the law, which prevailed at the time. We will not *602 Sav that a case may not exist, in which an ignorance of tjhtr ^aw> ™a)’ n°f ^e,a basis ^or re^'ie0 but we have no hesitation in saving that the present is not a case in which it is proved to have existed, or if it did exist, it could form the faesis for relief. There has been a tenure then, in. the appellees, of these slaves, for upwards of twenty-five years, for the ]as^- seven of them, with the presumed knowledge (at least), on the part of the appellants, of their rights, and for that time at least, the possession must-be- considered as adverse to, and not as fiducial, for them. But considered as a doubt- ^ claim, settled in 1809, it ought not, upon well established principles, to be disturbed.
Wickliffe for eppcilanl, Talbot and Pope contra.
In any view, therefore, which we have been able to take of the case, we have not been able to discern fraud, mistake, or error, which will justify us in reversing the decree of the court below, and altering that state of things which had so long existed, and had been so long affirmed by the parties.
The decree must, therefore, be affirmed with costs,.